COLORADO COURT OF APPEALS                                    **2017COA87**

Court of Appeals No. 14CA0202
El Paso County District Court No. 12CR2114
Honorable Robert L. Lowrey, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ryan Matthew Cardman,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE ROMÁN
Bernard, J., specially concurs
Berger, J., dissents

Announced June 29, 2017

Cynthia H. Coffman, Attorney General, Gabriel P. Olivares, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Katherine Brien, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     This case returns to us following a limited remand from the Colorado Supreme Court. *Cardman v. People,* (Colo. No. 16SC789, Apr. 10, 2017) (unpublished order). In *People v. Cardman,* 2016 COA 135 (*Cardman I*), we reached three conclusions. First, we held that a suspect who has invoked his right to counsel can reinitiate contact with the police through an agent, and the trial court did not err in finding that such third-party reinitiation had occurred in this case. Second, we declined to review — as waived — defendant's contention that the trial court erred by failing to hold a hearing to determine whether defendant's statement to police was voluntary. Third, we held that the trial court did not plainly err by admitting statements from the investigating detective commenting on the credibility of defendant and the victim.

¶ 2     Defendant, Ryan Matthew Cardman, petitioned for a writ of certiorari to the Colorado Supreme Court. The supreme court granted the petition, vacated the judgment in *Cardman I,* and, in light of its recent decision in *Reyna-Abarca v. People,* 2017 CO 15, remanded to this court for reconsideration of the trial court's failure to hold a hearing regarding the alleged promises made by the

1

detective to defendant during the interview. Because the supreme court denied certiorari on all other issues, *Cardman*, No. 16SC789, our opinion in *Cardman I* remains controlling as to third-party reinitiation and the detective's statements. 2016 COA 135.

¶ 3 We now reconsider review of the alleged promises during the police interview in light of *Reyna-Abarca.*

## I. Pertinent Background

¶ 4 A jury convicted defendant of multiple counts of sexual assault on a child. Defendant was arrested after the victim reported the abuse to the police. While initially denying any improper sexual contact with the victim, defendant admitted during an interview with police to three instances of sexual contact.

¶ 5 Before trial, defense counsel moved to suppress defendant's inculpatory statements. The trial court denied the motion after a suppression hearing.

¶ 6 As relevant here, we concluded in *Cardman I* that defendant had waived his voluntariness claim by failing to raise it during the suppression hearing. Accordingly, we declined to apply plain error review to defendant's contention that the trial court should have held a hearing regarding the voluntariness of his statement.

¶ 7     As noted, on remand, the supreme court directed us to reconsider defendant's second issue pressed for certiorari — in light of *Reyna-Abarca* — decided after we announced *Cardman I.* Specifically, we were directed to reconsider

> [w]hether the district court violated the defendant's constitutional right to due process and reversibly erred by admitting statements the defendant made to a detective without first determining whether the statements were voluntary and whether the defendant was entitled to specific performance of direct and/or implied promises made to him by the detective during the interrogation.

*Cardman*, No. 16SC789, 2017 WL 1369883.

¶ 8     Before we may reach the substance of the granted certiorari issue, however, we must first answer this question: What happens when the defendant, as in this case, does not challenge voluntariness at the suppression hearing?

## II.  Voluntariness Standards

¶ 9     "Under the due process clauses of the United States and Colorado Constitutions, a defendant's statements must be made voluntarily in order to be admissible into evidence." *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010); *see Mincey v. Arizona*, 437 U.S. 385, 398 (1978).

¶ 10    A trial court's findings of fact on the voluntariness of a statement will be upheld where they are supported by adequate evidence in the record. *Effland*, 240 P.3d at 878. However, the ultimate determination of whether a statement is voluntary is a legal question we review de novo. *Id.*

¶ 11    To be voluntary, a statement must be "the product of an essentially free and unconstrained choice by its maker." *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

¶ 12    "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991). Coercive governmental conduct may include physical abuse, threats, or psychological coercion. *Id.* at 843-44.

¶ 13    Whether a statement is voluntary must be evaluated on the basis of the totality of the circumstances under which it is given. *Effland*, 240 P.3d at 877. Relevant circumstances include: (1) "whether the defendant was in custody or was free to leave"; (2) "whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda*

4

rights"; and (3) "whether any overt or implied threat or promise was directed to the defendant." *Gennings*, 808 P.2d at 844. These considerations are not exclusive. *Id.*

¶ 14 "Threats and promises used by the interrogator factor into the analysis of voluntariness but are not conclusive. For such threats and promises to render a confession involuntary, they must have caused the defendant to confess, for example, where police have promised leniency in exchange for a confession . . . ." *People v. Wickham*, 53 P.3d 691, 695 (Colo. App. 2001).

¶ 15 The critical voluntariness inquiry is whether the individual's will has been overborne by the coercive behavior of law enforcement officials. *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *People v. Humphrey*, 132 P.3d 352, 361 (Colo. 2006).

¶ 16 "Voluntariness is an objective inquiry reviewing the record for outwardly coercive police action, not a subjective analysis attempting to arbitrarily surmise whether the defendant perceived some form of coercive influence." *People v. Ferguson*, 227 P.3d 510, 513-14 (Colo. 2010).

¶ 17 "[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a

reliable and clear-cut determination that the confession was in fact voluntarily rendered." *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

### III. When Voluntariness Goes Unchallenged at a Suppression Hearing

¶ 18 "[T]he Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession." *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977); *People v. Sanchez*, 180 Colo. 119, 122, 503 P.2d 619, 621 (1972) ("We are not prepared to say that the mere act of offering the statement into evidence is sufficient to raise an issue of its voluntariness. The defendant must make his objection known to the court by objection, motion, cross-examination, or some other means during the course of the trial which indicates to the judge that there is an issue of admissibility of the statement." (quoting *Neighbors v. People*, 171 Colo. 349, 357, 467 P.2d 804, 808 (1970))).

¶ 19 Here, an audio recording of the second interview was played at trial. During that interrogation, the detective told defendant that if he admitted to some, but less than all, of the allegations, he could go home:

> [Detective:] [After a suspect invokes his right to counsel,] [o]ur department policy asks that we

6

wait twenty-four hours before we re-contact the suspect and give him one last shot to say — hey, this is the information we've uncovered, can you explain some things? There is some gray area, and I just want to make sure that the stuff that happened is as much as she's talking about. . . .

[Detective:] Because we can — if we can provide an explanation to help this go away for you —

[Defendant:] I would love that.

[Detective:] So let's fix that. Let's fix that. Because right now, it's not going away. . . .

[Detective:] [I]f maybe you could meet [the victim] halfway on some of those things, that we can put the icing on the cake, put this in a drawer, have her go heal, have you turned around, get back with your wife, go to church, live your life, and put all of this behind you, right now today.

[Defendant:] I would love that, you have no idea.

[Detective:] Then let's do it. . . .

[Detective:] We both know where you wanna go in life and with your wife and church and everything. I'm not here to hang you, I'm not here to beat you up today. I'm here to do this [sounds of paper shuffling]. At the end of this sentence, I put this in a drawer. And I can't do that if you tell me that you had sex with this girl fifty, sixty times, I'm concerned. And then I have a different investigation. If there was some inappropriate sexual stuff that happened

once or twice, I want an explanation for that so I can do this [sounds of paper shuffling], so I can go home on my Friday, do you understand?  I'm trying to paint the picture, man.

[Defendant:] If I can get this all figured out, closed out, just done with, I can go home tomorrow.

[Detective:] Let's do it.

[Defendant:] That's what I want to do.

[Detective:] And if I can help with any of that here, I'd — you're damn skippy. . . .

[Detective:] Because I honestly think that if you can provide some sort of corroboration and some answers, maybe [inaudible] an apology or quick sorry for whatever it is, and I give that to [the victim], I think that would go away. . . .

[Detective:] What we don't want to hear is that Ryan Cardman wakes up over here every day and lusts for sexual contact with a kid.  And there's fifty, sixty times like what's she's saying.  We don't want to hear that.  But what is explainable and what people understand is . . . there was an accident, a momentary, one-time lapse and a bad decision occurred.  People understand that, okay?  What people don't understand is this guy over here who wakes up every day to wait 'til she's alone, 'til you're alone, to do those things.  That guy is the one we're worried about.  That's the guy that we try to send to prison and to lock up

8

and that's what I want to eliminate here today.
And, Ryan, I don't think you're that guy.[1]

## IV. Whether to Review Unpreserved Voluntariness Challenges for Plain Error

¶ 20    Defendant contends that statements he made in the second interview were not voluntary and argues the trial court erred by not sua sponte holding a hearing on the issue of the voluntariness of the statements. Although we have serious concerns with the police interrogation tactics used in this case, we cannot reach the merits of the voluntariness issue because defendant waived it by not raising it during the suppression hearing.

¶ 21    Defendant acknowledges that he did not raise this issue at the suppression hearing but urges us to review the issue anyway under a plain error standard of review. In our original opinion, we acknowledged the split of authority regarding whether constitutional issues raised for the first time on appeal should be reviewed for plain error. We declined to review for plain error,

---

[1] There is no transcript of the interview in the record, and the audio recording is very difficult to understand. The excerpts quoted are our best approximation of what was said based on the audio recording.

however, because we concluded that defendant had waived his right to a hearing on voluntariness.

¶ 22    After we issued our original opinion, the supreme court decided *Reyna-Abarca.* As pertinent here, the supreme court explained that its statement in *People v. Cagle*, 751 P.2d 614, 619 (Colo. 1988) — "[i]t is axiomatic that this court will not consider constitutional issues raised for the first time on appeal" — was dictum and concluded that unpreserved double jeopardy claims can be raised for the first time on appeal and should ordinarily be reviewed for plain error pursuant to Crim. P. 52(b). *Reyna-Abarca,* ¶¶ 2, 36.

¶ 23    The *Reyna-Abarca* court then rejected the People's argument that by failing to raise a Crim. P. 12(b)(2) challenge to the charging document in the trial court, a defendant waives his claim that convictions for both a greater and lesser included offense violate his double jeopardy rights. *Id.* at ¶¶ 38-45. The court reasoned that Crim. P. 12(b)(2) — which deems a defendant's failure to object to "defects in the institution of the prosecution or in the indictment or information or complaint" to constitute a waiver of such objection — was inapplicable because the double jeopardy claim "does not

10

amount to an objection regarding defects in the charging document." *Reyna-Abarca*, ¶ 2.

¶ 24 After carefully reconsidering this case in light of *Reyna-Abarca*, we again conclude that defendant waived his right to a hearing on voluntariness.

¶ 25 *Reyna-Abarca* did not foreclose the possibility that a defendant may waive certain rights; instead it rejected the specific application of waiver urged in that case. Even "[t]he most basic rights of criminal defendants are . . . subject to waiver." *Peretz v. United States*, 501 U.S. 923, 936 (1991). And in specific circumstances, a defendant may waive his rights by failing to object. For example, our supreme court in *Stackhouse v. People*, 2015 CO 48, ¶ 1, reaffirmed that "a defendant affirmatively waives his public trial right by not objecting to a known closure of the courtroom."

¶ 26 "Waiver is defined as the 'intentional relinquishment or abandonment of a known right.'" *Hinojos-Mendoza v. People*, 169 P.3d 662, 668 (Colo. 2007) (quoting *United States v. Olano*, 507 U.S.

11

725, 733 (1993)).  And, unlike a right that is merely forfeited, "there is no appeal from a waived right."  *Id.*[2]

¶ 27    Here, defendant waived his right to a hearing on the voluntariness of his statement by moving to suppress the incriminating statements *solely* on the basis that he did not reinitiate communication with the police, not because his statements were involuntary.  In contrast, he failed to raise voluntariness at any time during a two-day suppression hearing.  Failing to raise the issue of voluntariness during a suppression hearing is not equivalent to a failure to contemporaneously object to something during the heat of trial.  As discussed, defendant timely moved to suppress the incriminating statements, but only on the basis that he had not reinitiated contact with the police.  Under these circumstances, defendant cannot now collaterally attack the voluntariness of those statements by seeking remand for a voluntariness hearing.  To permit such a practice would create an

---

[2] "Invited error is akin to waived error.  Invited error obviously should not be reviewable for plain error." *People v. Greer*, 262 P.3d 920, 937 n.7 (Colo. App. 2011) (J. Jones, J., specially concurring) (citations omitted).

incentive for defendants to forgo raising the issue of voluntariness and then to seek remand on appeal if found guilty at trial.

¶ 28　Accordingly, defendant was afforded a suppression hearing but chose not to take advantage of the opportunity to litigate the voluntariness issue.  *See Hinojos-Mendoza,* 169 P.3d at 668 (statute allowing a lab report into evidence without in-person testimony from the analyst, unless the defendant requests such testimony in advance of trial, does not violate the Confrontation Clause because the statute provides the defendant the opportunity for cross-examination, and the confrontation right is waived if the defendant chooses not to take advantage of the opportunity to request the analyst's testimony as provided by the statute).

¶ 29　Defendant does not argue that he was unaware of the requirements that a statement be voluntary or of the need to request a voluntariness hearing.  Rather, he contends that he raised the issue of voluntariness during opening and closing statements at trial.

¶ 30　But remarks made at trial during opening and closing statements are insufficient to raise the voluntariness issue and warrant a hearing under *Jackson v. Denno,* 378 U.S. 368 (1964).

Rather, "[w]e must limit our review to the evidence presented at the suppression hearing." *People v. Gomez-Garcia*, 224 P.3d 1019, 1022 (Colo. App. 2009). Further, defendant cites no authority for the proposition that a trial court has a duty to sua sponte hold a hearing during trial on the issue of voluntariness where the interrogation tactics at issue become apparent during trial as well as the suppression hearing.

¶ 31    In our view, to require the trial court to hold a hearing on the voluntariness of a defendant's statements where the issue becomes apparent during trial would be overly burdensome and inefficient. Such an obligation could require a trial court in the middle of trial to sua sponte (1) order a new suppression hearing on the issue of voluntariness; (2) declare a mistrial; (3) convene a new jury; and (4) begin a new trial (even where the confession may have been allowed).[3]

---

[3] Moreover, were the trial court to sua sponte declare a mistrial, defendant would undoubtedly raise the issue of double jeopardy. *People v. Espinoza*, 666 P.2d 555, 558 (Colo. 1983) ("A mistrial declared without the consent and over the objection of the defendant invokes double jeopardy protection to bar retrial unless 'manifestly necessary' to preserve the public interest in a fair trial and a just verdict.").

¶ 32    Defendant relies on *Jackson* for the proposition that a trial court has a duty to sua sponte hold a hearing on the issue of voluntariness, absent an express objection by a defendant, anytime it should be evident to the trial court that voluntariness is an issue.

¶ 33    However, the defendant in *Jackson* raised the issue with the trial court.  Although he "did not specifically object to the admission of the confession initially, the trial court indicated its awareness that Jackson's counsel was questioning the circumstances under which Jackson was interrogated."  378 U.S. at 374.  The *Jackson* Court even quoted the colloquy between the trial court and Jackson's attorney, during which counsel objected to the use of the confession and explained to the court that "[the defendant] was in no mental condition to make the statement."  *Id.* at 374 n.4.

¶ 34    Here, no such colloquy between the court and defendant's counsel occurred at trial or at the suppression hearing that indicated defendant's objection on voluntariness grounds or the trial court's awareness that defendant was questioning the voluntariness of his statements.

¶ 35    Notably, in *Wainwright*, the Supreme Court explicitly rejected the very argument defendant makes here:

15

Respondent also urges that a defendant has a right under *Jackson v. Denno* to a hearing as to the voluntariness of a confession, even though the defendant does not object to its admission. But we do not read *Jackson* as creating any such requirement. In that case the defendant's objection to the use of his confession was brought to the attention of the trial court, and nothing in the Court's opinion suggests that a hearing would have been required even if it had not been. To the contrary, the Court prefaced its entire discussion of the merits of the case with a statement of the constitutional rule that was to prove dispositive that a defendant has a "right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness . . . ." *Language in subsequent decisions of this Court has reaffirmed the view that the Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession.*

433 U.S. at 86 (emphasis added) (citations omitted).

¶ 36    Thus, a defendant must request a hearing on the issue of voluntariness for the court to be required to hold one. *Id.*; *Lego*, 404 U.S. at 489; *Sanchez,* 180 Colo. at 122, 503 P.2d at 621. Defendant did not request a hearing on the issue of voluntariness and is thus not entitled to one.

¶ 37     Because defendant moved to suppress the statements solely

on reinitiation grounds, he waived the voluntariness claims.  We

have no error to review.  *See People v. Staton*, 924 P.2d 127, 133

(Colo. 1996) (To preserve a suppression issue for appeal, where

other grounds for suppression are stated in the motion to suppress,

defendant "must have stated [the issue] initially as a ground for his

motion to suppress."); *People v. Salyer*, 80 P.3d 831, 835 (Colo. App.

2003) (argument on appeal that the district court erred in denying

motion to suppress on voluntariness grounds was waived where the

defendant did not raise that argument in the district court but

raised other suppression arguments); *People v. Greer*, 262 P.3d 920,

937 (Colo. App. 2011) (J. Jones, J., specially concurring) ("If a

defendant in a criminal case waives an error in the trial court —

i.e., intentionally relinquishes or abandons a known right — he

waives any right to plain error review on appeal.").

## V.  Whether to Review Specific Performance Challenge for Plain Error

¶ 38     *Reyna-Abarca* did not foreclose the possibility of waiving the

enforcement of alleged promises either.  We likewise reject

defendant's contention that we must remand for a hearing on

whether defendant is entitled to specific performance of alleged promises made by the detective during the interview. This is the other side of the same coin as the voluntariness question. That is, what happens when the defendant, as in this case, does not timely seek to enforce alleged governmental promises?

¶ 39    We conclude that just as defendant waived his voluntariness claim arising from coercive promises by the police, so too did he waive his claim for a remedy for the alleged unkept promises. *See also People v. Blessett,* 155 P.3d 388, 397 (Colo. App. 2008) (declining to address the defendant's claim for enforcement of an alleged governmental promise during an interview because it was not raised in trial court and would often require factfinding, which an appellate court may not undertake).

¶ 40    A defendant who reasonably relied on a governmental promise in making incriminating statements during a police interrogation may move for specific performance. Still, the court must fashion a remedy "that can secure substantial justice to the defendant and at the same time accommodate the legitimate interests of the government" — such as suppression of evidence rather than dismissal of charges. *People v. Manning,* 672 P.2d 499, 503, 512-13

(Colo. 1983); *see also People v. Marquez*, 644 P.2d 59, 62-63 (Colo. App. 1981) (affirming trial court's determination that dismissal of case, although promised by police in exchange for cooperation in different case, was not appropriate and noting that "[a]greements to dismiss pending prosecutions, distinguished from plea bargains by the absence of any element of admission of guilt, often have been deemed contrary to public policy and, hence, unenforceable").

¶ 41 Here, defendant cites no case requiring a trial court to sua sponte hold a hearing to determine, in this context, whether the defendant is entitled to specific performance of alleged promises made to the defendant by the police during an interview where he did not seek to enforce them prior to trial.

## VI. Conclusion

¶ 42 The judgment is affirmed.

JUDGE BERNARD specially concurs.

JUDGE BERGER dissents.

JUDGE BERNARD, specially concurring.

¶ 43　I concur in full with the majority opinion.  I write separately as far as Part IV of the majority opinion is concerned to provide additional reasons why I respectfully disagree with the dissent's conclusion that we should review the voluntariness question for plain error.

## I.  Introduction

¶ 44　"[T]here are many valid reasons underlying the practice of requiring pretrial motions, which doubtless explains why so many jurisdictions now subscribe to that approach."  6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.1(a) (5th ed. 2014).  These valid reasons include:

- avoiding "interruptions of a trial in progress with auxiliary inquiries," *United States v. Mauro,* 507 F.2d 802, 806 (2d Cir. 1974);

- avoiding "the serious personal inconvenience to jurors and witnesses which would result from interruptions and delay once the jury had been selected and the trial had commenced," *id.*;

- avoiding "the necessity of declaring a mistrial because the jury has been exposed to unconstitutional evidence," *State v. Lawrence*, 255 So. 2d 729, 732 (La. 1971);

- avoiding "the waste of prosecutorial and judicial resources occasioned by preparation for a trial" because "a trial could be avoided if a timely and successful motion were made in advance," *Mauro*, 507 F.2d at 806;

- giving the defendant the opportunity to avoid a trial by pleading guilty and seeking concessions from the prosecution if the trial court denies the motion, *see* LaFave at § 11.1(a);

- giving the prosecution the opportunity to "change the theory of its case [in order] to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy" if the trial court grants the motion, *United States v. Sisca*, 503 F.2d 1337, 1348 (2d Cir. 1974); and

- giving the prosecution the opportunity to pursue an interlocutory appeal before jeopardy has attached if the trial court grants the motion, *see* C.A.R. 4.1(a); *People v. Traubert*, 199 Colo. 322, 330, 608 P.2d 342, 348 (1980).

## II. A General Rule

¶ 45 The general rule in Colorado is that "[a] defendant aggrieved by an alleged involuntary confession or admission made by him" shall file a motion to suppress it "before trial . . . ." Crim. P. 41(g). In concert with my observations in the introduction, the general rule promotes important policies. It "reduces trial inefficiencies by requiring the parties to criminal proceedings to pursue discovery vigorously prior to trial." *People v. Tyler*, 874 P.2d 1037, 1039 (Colo. 1994). And it "permits both the prosecution and the defense to prepare for trial with the benefit of enhanced knowledge of what evidence will and will not be introduced at trial." *Id.* The supreme court thinks that these polices are so important that "parties to [criminal] proceedings *must adhere* to [the] requirements" of Crim. P. 41. *Id.* at 1040 (emphasis added).

¶ 46 Motions to suppress "should state with reasonable specificity the legal grounds upon which" they are based. *People v. Jansen,* 713 P.2d 907, 912 n.8 (Colo. 1986). Such a specific statement "is necessary both to put the prosecution on notice of the contentions it must be prepared to meet at a suppression hearing and to inform the court of the issues to be decided." *Id.*

¶ 47    To make "meaningful appellate review" possible, a "trial court must make sufficiently clear and detailed findings of fact and conclusions of law *on the record*" before it "may rule that a confession is voluntary and admissible, or that it is involuntary and must be suppressed." *People v. McIntyre*, 789 P.2d 1108, 1110 (Colo. 1990). "By failing to present [his] claims" to the trial court, defendant in this case "effectively prevented the court from making factual findings that would be germane to the disposition" of those claims. *United States v. Hamilton*, 587 F.3d 1199, 1216 n.9 (10th Cir. 2009). And we obviously cannot make such factual findings on appeal. *See People v. A.W.*, 982 P.2d 842, 852 (Colo. 1999)("Appellate courts are not empowered to make factual findings[.]").

¶ 48    When a defendant does not file a motion to suppress, the prosecution "may justifiably conclude that it need not introduce the quality or quantity of evidence needed otherwise to prevail." *United States v. Chavez-Valencia*, 116 F.3d 127, 132 (5th Cir. 1997); *accord United States v. Burke*, 633 F.3d 984, 990 (10th Cir. 2011); *United States v. Rose*, 538 F.3d 175, 182-83 (3d Cir. 2008). So, if we were to review defendant's contention for plain error, the

prosecution would be "forced on appeal to rely on an underdeveloped record in defending itself from the suppression argument." *Rose*, 538 F.3d at 182; *accord Burke,* 633 F.3d at 990; *Chavez-Valencia,* 116 F.3d at 132. This strikes me as manifestly unfair to the prosecution.

### III. A Corollary to the General Rule

¶ 49 An oft-repeated corollary to the general rule breathes life into the policies that support it: An appellate court will not consider a suppression issue on appeal that was not raised in the trial court. *See People v. Martinez,* 200 P.3d 1053, 1055 n.1 (Colo. 2009); *People v. Staton,* 924 P.2d 127, 133 (Colo. 1996); *Jansen,* 713 P.2d at 912; *People v. Cobb,* 690 P.2d 848, 853 (Colo. 1984); *People v. Gouker,* 665 P.2d 113, 117-18 (Colo. 1983); *People v. L.A.,* 199 Colo. 390, 393, 609 P.2d 116, 118 (1980); *People v. Greer*, 262 P.3d 920, 937 (Colo. App. 2011)(J. Jones, J., specially concurring); *People v. Samuels,* 228 P.3d 229, 238 (Colo. App. 2009); *People v. Russom,* 107 P.3d 986, 991 (Colo. App. 2004); *People v. Lee,* 93 P.3d 544, 547 (Colo. App. 2003); *People v. White*, 64 P.3d 864, 871 (Colo. App. 2002); *People v. Young,* 987 P.2d 889, 893 (Colo. App. 1999); *People v. Lucero*, 985 P.2d 87, 91 (Colo. App. 1999).

¶ 50    I think that *Neighbors v. People*, 171 Colo. 349, 356-58, 467 P.2d 804, 808 (1970), describes why the corollary should apply to voluntariness issues.  In that case, the supreme court first recognized the holding in *Jackson v. Denno*, 378 U.S. 368, 376-77 (1964): "[W]henever voluntariness [of a defendant's statement i]s an issue in the trial, there must be a hearing before the trial judge and a determination made on that issue."  *Neighbors*, 171 Colo. at 356-57, 467 P.2d at 808.

¶ 51    But the court was "not prepared to say that the mere act of offering the statement into evidence is sufficient to raise an issue of its voluntariness."  *Id.* at 357, 467 P.2d at 808.  Instead, "[t]he defendant *must make his objection known* to the court by objection, motion, cross-examination, or some other means during the course of the trial which indicates to the judge that there is an issue of admissibility of the statement."  *Id.* (emphasis added).

¶ 52    As a result, the court did "not agree with a philosophy which allows a defendant to get his theory of the case before the jury and then, if he is convicted, permits him to obtain a new trial on the grounds that evidence should not have been admitted."  *Id.*  So, "[b]ecause voluntariness was never in any way or by any stretch of

the imagination made an issue in the case, there is no basis upon which the lower court could determine that issue" in a postconviction motion. *Id.* at 358, 467 P.2d at 808; *accord People v. Sanchez,* 180 Colo. 119, 122, 503 P.2d 619, 621 (1972).

¶ 53 Divisions of this court have subsequently applied the corollary directly to voluntariness issues. *People v. Zadra,* 2013 COA 140, ¶ 26, *aff'd,* 2017 CO 18; *People v. Villarreal,* 131 P.3d 1119, 1123 (Colo. App. 2005), *aff'd on other grounds,* 2012 CO 64; *People v. Vigil,* 104 P.3d 258, 267 (Colo. App. 2004), *aff'd in part and rev'd in part on other grounds,* 127 P.3d 916 (Colo. 2006); *People v. Salyer,* 80 P.3d 831, 835 (Colo. App. 2003).

## IV.  The Law in Other Jurisdictions

### A.  Other States

¶ 54 Some of our sister states have applied the corollary to the general rule to voluntariness issues, too. *See, e.g., State v. Wilson,* 793 P.2d 559, 560 (Ariz. Ct. App. 1990)("[T]here was no burden on the prosecution to show that the statements were made voluntarily since the issue was not before the court absent a filing of a procedurally proper suppression motion."); *State v. Burgess,* 355 P.3d 1287, 1289 (Idaho Ct. App. 2015)(noting that the issue

26

whether a statement was coerced should be raised by a motion to suppress before trial or it is waived); *People v. Hills*, 389 N.E.2d 873, 876 (Ill. App. Ct. 1979)("[A]ny question as to the voluntariness of a confession is waived if defendant does not raise the issue by motion to suppress or by objection at trial."), *aff'd and remanded*, 401 N.E.2d 523 (Ill. 1980); *State v. Floyd*, 347 S.W.3d 115, 123 (Mo. Ct. App. 2011)(the defendant waived his right to a *Jackson-Denno* hearing on the voluntariness of his statement because he did not file a pretrial motion).

## B. Federal Law

¶ 55    Federal circuit courts of appeal are trying to figure out what a 2014 amendment to Fed. R. Crim. P. 12(e) means.  Before the amendment, the Rule read that a defendant waived any suppression issues that she did not include in a pretrial motion to suppress.  *See United States v. Soto*, 794 F.3d 635, 648 (6th Cir. 2015).  The amendment removed the reference to waiver from the Rule.

¶ 56    Some courts think that the change means that appellate courts can review suppression issues that were not raised until

appeal for plain error. *Id.* at 655; *United States v. Sperrazza*, 804 F.3d 1113, 1118-19 (11th Cir. 2015).

¶ 57 Other appellate courts will only review an unpreserved suppression issue if the defendant can show "good cause" why she did not file a pretrial motion to suppress. *See United States v. Schropp*, 829 F.3d 998, 1003-04 (8th Cir. 2016); *United States v. Daniels*, 803 F.3d 335, 351-52 (7th Cir. 2015).

¶ 58 The Tenth Circuit falls into the "good cause" category. In 2011, a panel of that court held that the former waiver language in Fed. R. Crim. P. 12(e) "preclude[d] plain error review on appeal." *Burke*, 633 F.3d at 991 n.2. The 2014 amendment has apparently not changed at least some of the judges' minds. *See United States v. Shrader*, 665 F. App'x 642, 649 n.6 (10th Cir. 2016)(unpublished opinion); *United States v. Franco*, 632 F. App'x 961, 963 n.1 (10th Cir. 2015)(unpublished opinion). *But see United States v. Garcia-Escalera*, 632 F. App'x 942, 944 n.1 (10th Cir. 2015)(unpublished opinion)("We acknowledge the 2014 amendment might call into question *Burke*'s waiver analysis. But we need not resolve whether *Burke* remains good law because [the defendant]

doesn't challenge the government's assertion that the 2002 version of Rule 12 applies in this case.").

¶ 59 I consider the "good cause" cases to be more persuasive. So, if I were to apply that standard in this case, defendant has not provided any explanation for why he did not include the issue of the voluntariness of his statements in his motion to suppress. Almost by definition, he has not shown good cause.

## V. Problems Created by a Remand

¶ 60 I do not think that remanding the case to the trial court to hold a hearing, to make factual findings, and to reach legal conclusions is a viable remedy, either. The trial in this case ended with a guilty verdict in early November 2013, so we would be asking the trial court and the parties to return to an issue that is now three-and-one-half years old. I question whether, after this length of time, a remand would be evidentially profitable: memories dim with the passage of time; evidence deteriorates or gets lost; witnesses die or move away; and victims may be forced to once again confront events that they wish to put behind them. *See United States v. Mechanik*, 475 U.S. 66, 72 (1986)(discussing the "substantial social costs" of reversing a conviction); *People v.*

*Sepulveda*, 65 P.3d 1002, 1008 (Colo. 2003)(same). Our supreme court cautioned us to avoid "sua sponte review and remand when, given the passage of time, there is no reasonable possibility that the trial court could develop a better record upon which to proceed." *Moody v. People*, 159 P.3d 611, 617 (Colo. 2007). I respectfully submit that this is one of those cases.

## VI. The Proper Approach to the Problem: Crim. P. 35(c)

¶ 61    If we were to evaluate the question of whether defendant's statement was involuntary in this direct appeal employing plain error review, we could not answer the related question of why defense counsel did not file a motion to suppress. The related question is an important one to answer because it is wrapped up in the issue of whether the voluntariness of defendant's statement is properly before us. It is wrapped up in that issue because the voluntariness of the statement may be *irrelevant* if defense counsel deliberately chose not to file a suppression motion for a sound strategic reason.

¶ 62    I think that figuring out why defense counsel did not file a motion to suppress is a foundational question that we must answer before we can move on to resolving the voluntariness question, but

we do not now have a complete picture of the facts that are necessary to answer the foundational question. And, if we ignore the foundational question and proceed to employ plain error review to resolve the voluntariness question without a complete factual picture, we risk reversing a conviction even though defense counsel, perhaps after consulting with his client, may have *wanted* the jury to hear defendant's statement.

¶ 63    In other words, if an attorney deliberately chooses not to file a motion to suppress, thereby intentionally denying a trial court the opportunity to rule on the voluntariness of a defendant's statement, then the true issue that we should be resolving is whether the attorney was ineffective. We cannot decide that issue on direct appeal. *See Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003)("[D]efendants have regularly been discouraged from attempting to litigate their counsels' effectiveness on direct appeal."). Rather, it should be resolved in the context of a Crim. P. 35(c) proceeding. *See id.*

¶ 64    Attorneys may have good reasons, bad reasons, or no reason at all for why they do not file motions to suppress statements. But we cannot, on direct appeal, evaluate the merit or demerit of such

reasons because this is one of those "situations in which facts outside the record [are] critical" to the analysis. *See Moore v. People*, 2014 CO 8, ¶ 13. Even if we might, on first blush, think that an attorney's decision not to file a motion to suppress a defendant's statement was "seemingly unusual or misguided," the trial record probably will "not reflect whether [an attorney] had a sound strategic motive or took the action because his alternatives were even worse." *Ardolino*, 69 P.3d at 77. Indeed, an attorney's "reasons for omissions are even less likely to be reflected in the trial record." *Id.*

¶ 65  Why, one might ask, would defense counsel in this case want the jury to hear that defendant admitted that he had twice placed the victim on his lap; that he had twice ejaculated; and that he had touched her vaginal area on one of those occasions? Defense counsel's reason for not filing a motion to suppress could have been: "I wanted to use what the detective said during the statement to defendant's advantage. I wanted to put the detective's investigation on trial in the hope that I could convince the jury that he had put damning words into defendant's mouth."

¶ 66    This is not a far-fetched possibility because defense counsel did just that.  During closing argument, he referred to the detective's "inappropriate technique" and to his use of "deception" to "try to get [defendant] to open up."  But defendant kept denying responsibility for the crime, so the detective "had to take it to the next level."

¶ 67    Defense counsel then pounced.  He focused on inconsistencies between the detective's trial testimony about the promises that the detective had made to defendant and the detective's comments in the tape recording of defendant's statement about those promises. Defense counsel played several excerpts from the tape, and he repeatedly told the jury that it *should listen to the tape.*

> [The detective] told you at the very end [of his testimony] that, "I never told him he could go home."  But you heard the audio.  *You know that's not true.*  You know that's what he implied – strongly implied, and . . . any reasonable person would infer it that way.
>
> He testified he never implied that [defendant] would go home if he said he did something small, . . . if something happened maybe less than five or six times.  *That's not true.*  These are [the detective's] words:
>
> (Excerpt of audio recording played.)

33

*He understands.  What he understands is: "You get to go home on Friday, so do I."*

. . . .

(Excerpt of audio recording played.)

. . . .

*And you all remember during the . . . cross-examination of [the detective], when I was playing that recording, what [defendant] said, "I can deal with this today and tomorrow I can go home?"  [The detective] says, "Let's do it."*

Here's the thing, ladies and gentlemen: This recording will be yours.  *Listen to it.*  Don't take my word.  Don't take the district attorney's word.  Don't take [the detective's] word about what he says is in there.  *Listen to the recording.*

. . . .

The district attorney has told you that . . . what [defendant] confessed to came out of his own head.  It was just happenstance that it matched [the victim's] statement, that nobody said that to him at all.  I disagree.  If you listen to the recording, what [defendant] confesses to was something *that was fed to him by that man* [the detective].

When . . . it didn't fit with [the detective's] theory, he said, "I don't believe you."  When it did, he said, "Good job.  Good job.  You're doing heroic.  We're 97 percent of the way there.  Just a – little bit more."

. . . .

What [the detective] does is akin to a feeding frenzy.  *"I'm going to give you everything you need to confess.*  All you have to do is remember what I said and go with it."

. . . .

Listen to what [the detective] tells this man before he gives his supposed confession.

(Excerpt of audio recording played.)

. . . .

Everything that [the detective] wanted to hear *he fed to [defendant]*, everything.

. . . .

[The detective] used not so veiled threats, fed [defendant] the lines and subtly, not aggressively, *subtly coerced a confession out of him by promising him -- maybe not using the word "promise,"* letting him know that: "If you tell me it's a couple of things, you get to go home to your wife."  [Defendant] confirmed that.  He said, "Let's do it.  Give her closure.  You'll move on with life."  *All the while saying that, he knew it wasn't true.*

. . . .

[The detective] fed a confession to [defendant] under the pretense [defendant] would be able to get to go home to his old life. . . .  [A]t the end of the day it's [the detective's] tactics.  *Those are the reason[s] that innocent people get*

> *convicted.* As he told you, he had a target in this investigation. You don't have a target. You have an obligation. Your obligation is to *listen to that recording*, weigh[] the evidence, and find [defendant] not guilty.

(Emphasis added.)

¶ 68 Defendant can still have his day in court on this issue, but it should not be today. Instead, he could file a Crim. P. 35(c) motion. Testimony produced at *that* hearing might provide an answer to the question of why defendant's counsel did not file a motion to suppress. And, depending on the nature of the answer, the voluntariness of defendant's statement could take center stage.

## VII. Conclusion

¶ 69 I cannot find a single published case decided after *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977), in which a Colorado appellate court has expressly held that the plain error standard should be used to review an unpreserved contention that a defendant's statement was involuntary. (Recall from the majority opinion that *Wainwright* rejected the idea that "a defendant has a right under *Jackson v. Denno* . . . to a hearing as to the voluntariness of a confession, even though the defendant does not object to its

admission." *Wainwright*, 433 U.S. at 86.)  I submit that the general rule and its corollary are the reasons for this lack of precedent.

¶ 70    The general rule and its corollary are not arcane; they are common knowledge.  They are not mysterious; they provide clear notice.  They are not complicated; they are easy to understand. They are not arbitrary; they spring from important policies.  They are not of recent origin; they have been around for a long time.  So the problems that we would cause if we ignore them and review the statement in this case for plain error will not be minor; those problems will be profound.  We would upset a pretty big applecart.

¶ 71    And what would we gain?  It is, of course, fundamentally important that convictions be based on reliable evidence, and involuntary statements are not reliable.  But I respectfully submit that we cannot tell, when applying the lens of plain error review, whether defendant's statement was involuntary because he did not ask the trial court to resolve this issue.  The prosecution therefore did not submit evidence to show that the statement was voluntary. The trial court therefore did not make the crucial findings of fact that would allow us to answer this question.  We therefore do not know why defense counsel did not file a motion to suppress.  And

we therefore do not have the record that we need to make a decision.

¶ 72    I recognize that we have a recording of defendant's statement in the record.  But we do not know, for example, whether the prosecution had evidence of what defendant and the police officers discussed before or after the statement.  We do not know whether such evidence would make a difference in the evaluation of the statement.  We do not know a great many things.  And, as I observed above, I think that the chances that a hearing on remand would cast light on this issue are iffy.

¶ 73    What would we be telling trial courts if we subject the voluntariness issue in this case to plain error review?  Trial courts are intimately familiar with the general rule and its corollary because defense counsel file motions to suppress statements in criminal cases all the time.  If we were to review the statement in this case for plain error, would we be sending the message that we expect trial courts, without prompting from anyone, to intervene *in the middle of a trial* to raise the issue of whether a statement is voluntary?  Are we asking courts to assume that defense counsel did not have a good reason, perhaps rooted in sound trial strategy,

to refrain from filing a suppression motion?  Are we asking courts to speculate that there is no other evidence, besides the evidence admitted at trial, that might bear on the issue of whether the statement is voluntary?

¶ 74    As I indicated above, I think that the right place to resolve this issue is in a Crim. P. 35(c) hearing.  Defendant might be successful; he might not be.  I have no crystal ball.  But I do know that requiring defendant to take that route preserves the general rule and its corollary.  And I think that is worth the candle because preserving them will likewise preserve the "valid reasons underlying the practice of requiring pretrial motions . . . ."  LaFave at § 11.1(a); *see also Tyler*, 874 P.2d at 1039.

JUDGE BERGER, dissenting.[1]

¶ 75     Short of physical torture, I cannot imagine police tactics that are more likely to lead to false confessions, and thus wrongful convictions, than the police conduct in this case.  The facts are stark: a person is being questioned by the police regarding extremely serious crimes, the penalties for which are effective life sentences and almost unimaginable societal opprobrium.  The police officer tells the suspect — no, *promises* the suspect — that if he admits to what the officer characterizes as relatively minor crimes (without telling the suspect that these relatively minor crimes also could result in an effective life sentence) then he can go home to his wife and child and no charges will be filed.

¶ 76     Notwithstanding these facts, the majority refuses to review the merits of Cardman's claim that he was deprived of due process of law when his inculpatory statements were admitted against him. As I did in *People v. Cardman*, 2016 COA 135, *vacated*, (Colo. No.

---

[1] Because the supreme court did not grant certiorari on the reinitiation of contact issue, I, like the majority, do not address that issue.  I adhere to my previously expressed views on that issue.  *See People v. Cardman*, 2016 COA 135, ¶¶ 97-145 (Berger, J., dissenting), *vacated*, (Colo. No. 16SC789, Apr. 10, 2017) (unpublished order).

16SC789, Apr. 10, 2017) (unpublished order), I respectfully dissent from the majority's refusal to address the voluntariness of Cardman's inculpatory statements. In my view, this record presents a substantial question regarding the voluntariness of those statements and thus raises very serious questions regarding the reliability of Cardman's convictions.

¶ 77    Events that have occurred since our original opinions in this case provide more support for my position that the admission of Cardman's inculpatory statements must be reviewed for plain error. First, the supreme court has finally put to rest reliance on *People v. Cagle*, 751 P.2d 614, 619 (Colo. 1988), for the proposition that unpreserved constitutional questions are waived. The original special concurrence relied on *Cagle* in support of its position that Cardman waived any claim that his statements to the police were involuntary. Any further reliance on *Cagle* for this purpose is foreclosed by the supreme court's recent decision in *Reyna-Abarca v. People*, 2017 CO 15.

¶ 78    Second, the supreme court summarily vacated our judgment and directed us to consider whether *Reyna-Abarca*, decided after we issued our original opinions in this case, authorizes plain error

review in this case.[2]  While I recognize that a denial of certiorari has no precedential value, it is not unreasonable to construe the grant of certiorari in this case and the summary vacation of our judgment as a sign that the supreme court was concerned about the majority's disposition of the involuntariness issue.  *See People v. McAfee*, 160 P.3d 277, 280 (Colo. App. 2007) (recognizing that there may be a multitude of reasons why the supreme court denies certiorari).[3]

¶ 79    Despite all this, the majority adheres to its original decision and the special concurrence agrees that Cardman waived the most consequential issue in this case.

## I.  The Basic Premise of Plain Error Review

¶ 80    Plain error review plays a critical, albeit limited, role in our criminal justice system.  The doctrine, codified in Crim. P. 52(b), recognizes that mistakes will be made in criminal cases, sometimes

---

[2] The supreme court also directed us to consider whether the promises made by the police to Cardman must be enforced.  I address the merits of that issue below.

[3] Obviously, when the supreme court summarily vacated our prior judgment, it knew that *Reyna-Abarca v. People*, 2017 CO 15, was a double jeopardy case, not a case involving an unpreserved suppression question.  Given that, the fact that it was a double jeopardy case and not a suppression case should carry little weight.

very serious mistakes.[4] It balances the need for procedural rules and compliance with those rules with the essential underlying goal of the criminal justice system: fair and reliable adjudication of allegations of criminal conduct. Over decades, the Colorado Supreme Court has consistently recognized the need for and availability of plain error review, as it did recently in *Reyna-Abarca.*

¶ 81 Thus, the question is not whether procedural rules are necessary for the orderly administration of criminal justice. They are. Nor is the question whether there must be consequences when those rules are violated. There must be.

¶ 82 The concurrence is correct that there is a procedural rule, Crim. P. 41(g), governing the timing of filing motions to suppress and that Cardman did not comply with that rule (although I note that Crim. P. 41(g) says nothing about the consequences of noncompliance, and has never been applied to bar review of a voluntariness claim raised for the first time on appeal). And, under both my analysis and the concurrence's, there are important consequences that flow from that failure.

---

[4] By its terms, Crim. P. 52(b) does not except suppression issues from its reach.

¶ 83    By failing to timely raise his involuntariness claim, Cardman forfeited his claim, meaning that he lost the right to have the claim reviewed under the otherwise applicable constitutional standard of review — harmlessness beyond a reasonable doubt.  *Hagos v. People*, 2012 CO 63, ¶ 11.  That forfeiture is no small matter; given the egregious police conduct in this case, review under that standard almost certainly would have required suppression of Cardman's statements and, if the trial court had nevertheless admitted the statements, a new trial.

¶ 84    But, the majority does not hold merely that Cardman forfeited his claim, it holds that he waived it, which precludes all review, even plain error review.  *United States v. Olano*, 507 U.S. 725, 732-33 (1993); *People v. Lopez*, 129 P.3d 1061, 1065 (Colo. App. 2005).  I acknowledge that Cardman is limited to plain error review, a type of review that is designed to make relief seldom available and which, in practice, meets or exceeds its design parameters.  To say, as the majority does, that Cardman had an opportunity to object on voluntariness grounds and failed to do so, or, as the concurrence does, that there was a rule violation and that there must be consequences to that violation, are wholly insufficient by

44

themselves to then support the further conclusion that Cardman waived, rather than forfeited, his claim. "The courts do not presume acquiescence in the loss of fundamental constitutional rights, and therefore indulge every reasonable presumption against waiver." *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984), *holding modified on other grounds by People v. Blehm*, 983 P.2d 779 (Colo. 1999).

¶ 85    The majority's assertion that Cardman waived his voluntariness claim because he did not raise it at the suppression hearing rests on a shaky legal foundation. First, I do not see how it makes any difference, for purposes of the availability of plain error review, whether a defendant fails to raise a specific suppression claim despite the district court entertaining a suppression hearing or whether he or she fails to raise any suppression issue at all. A fair reading of the majority's opinion is that a defendant who fails to raise *any* suppression claim before the trial court may be entitled to plain error review, but a defendant who raises a suppression claim on one ground but not another has waived that ground — a puzzling result.

¶ 86   Second, this case is entirely different from *Hinojos-Mendoza v. People*, 169 P.3d 662, 668 (Colo. 2007), on which the majority relies. In that case, the defendant argued that his confrontation rights were violated when the trial court admitted a lab report into evidence without in-person testimony from the analyst. The supreme concluded that the defendant had waived his confrontation rights because he failed to request, as required by statute, the in-person testimony in advance of trial. The court concluded that because "[t]he right to confrontation falls into the class of rights that defense counsel can waive through strategic decisions," and because "we presume that attorneys know the applicable rules of procedure," it could "infer from the failure to comply with the procedural requirements that the attorney made a decision not to exercise the right at issue." *Id.* at 669-70.

¶ 87   I recognize that some rights may be waived by the mere failure to object. *See, e.g., Stackhouse v. People*, 2015 CO 48, ¶ 1. But in both *Hinojos-Mendoza* and *Stackhouse*, the defendant's failure to object could fairly be characterized as a strategic decision. It is unreasonable to assume that Cardman's failure to challenge the voluntariness of his statements was strategic. Indeed, even the

concurrence suggests that the failure to raise the voluntariness claim may be grounds for a claim of ineffective assistance of counsel. I do not understand how the failure to object to the voluntariness of Cardman's inculpatory statements was strategic, yet also "fell below an objective standard of reasonableness." *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

¶ 88 *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977), does not aid either the majority or the concurrence. By my reading, *Wainwright* holds nothing more than *if* a state, by rule or judicial decision, provides that a suppression issue that is not made in accordance with a rule governing such questions is waived, that rule or judicial decision does not offend the United States Constitution. *Id.*

¶ 89 In contrast, the question here is whether, as a matter of state law, suppression issues should be treated entirely differently than virtually every other type of unpreserved error. In my view, the answer is no.

¶ 90 The daunting requirements for finding plain error eliminate any reasonable concern by the majority or the concurrence that such plain error review will devour the rules of criminal procedure

47

and lead criminal litigants to hold back claims of error at trial and then, when they lose, simply make the objections on appeal that they should have made at trial. As our opinions demonstrate, findings of plain error are few and far between, as they should be. *Hagos*, ¶ 23. In almost every case, a claim of plain error regarding unchallenged confessions will founder on the "obviousness" component of plain error review. *Id.* at ¶ 18 ("Plain error addresses error that is both 'obvious and substantial.'" (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005))). In the vast majority of cases in which there is an unpreserved claim of involuntariness, there is virtually no possibility that an appellate court will find plain error.

¶ 91 But this case is different. Here, the trial court knew precisely, and the appellate record demonstrates convincingly, the factual basis for the claim of involuntariness. Some of the details were spread before the trial court in counsel's colloquy with the detective at the suppression hearing. The other sordid details were displayed when the prosecution played the audio recording of Cardman's second interrogation for the jury. In comparing the facts of this case to those in *People v. Quintana*, 198 Colo. 461, 463, 601 P.2d

350, 351 (1979), in which the sheriff's "implied promises" prior to the defendant's confession rendered that confession involuntary, it was obvious that the police conduct here was unconstitutional.[5]

¶ 92     I cannot square the majority's waiver conclusion with the underpinnings of the plain error doctrine.  To avoid plain error review and to declare a waiver requires more than a finding that a defendant did not abide by a particular procedural rule.  After all, plain error review comes into play only when there has been a violation of a procedural rule; if a defendant complies with the applicable procedural rules then he is entitled to review under harmless error or constitutional harmless error, depending on the matter at issue.  *Id.* at ¶ 9.

¶ 93     The majority's analysis, and in particular the concurrence's analysis, prove too much.  Indeed, when carefully scrutinized, these opinions are nothing less than a frontal attack on the doctrine of plain error review.  The concurring opinion could easily be transformed into a scholarly law review article advocating the

---

[5] In contrast, in *People In Interest of Z.T.T.*, 2017 CO 48, ¶ 1, the Colorado Supreme Court reversed the trial court's suppression order where the police interview was conversational, friendly, and devoid of coercive promises or threats.

abolition of plain error review. While there is nothing inherently wrong with scholarly arguments for the abolition of plain error review, that course is not available to Colorado intermediate appellate court judges. This is so because we are bound by Colorado Supreme Court precedents and there can be no dispute that *Reyna-Abarca* squarely holds that plain error review is the law of Colorado.[6]

¶ 94 What's more, the supreme court has never expressly held that a defendant's failure to raise a voluntariness claim before the trial court constitutes a waiver of that claim on appeal. I am not persuaded by the concurrence's reliance on *People v. Jansen*, 713 P.2d 907, 912 n.8 (Colo. 1986), to support that proposition. In *Jansen*, the supreme court declined to address the People's argument that the defendants' motions to suppress were "facially

---

[6] I cannot plausibly contend that plain error review is available regardless of the issue presented. Over a strong dissent by Justice Márquez, the supreme court recently held that a criminal defendant's failure to object to the closing of the courtroom to the public effected a waiver, not just a forfeiture, of the constitutional right to a public trial. *Stackhouse v. People*, 2015 CO 48, ¶ 5. While it is hazardous to rank constitutional rights in view of their importance to an orderly society, I nevertheless note that the admission of a criminal defendant's involuntary statements violates the Due Process Clause, one of the fundamental guarantees of the Constitution.

insufficient" because that argument was not raised before the district court. *Id.* at 912. In a footnote, which clearly is dictum, the court stated that

> we note in passing that such motions should state with reasonable specificity the legal grounds upon which the motions are based. This is necessary both to put the prosecution on notice of the contentions it must be prepared to meet at a suppression hearing and to inform the court of the issues to be decided.

*Id.* at 912 n.8. The court said nothing whatsoever about the availability of plain error review of claims that are raised for the first time on appeal.

¶ 95    The footnote in *Jansen* spawned a line of opinions from this court, also relied on by the concurrence, refusing to address unpreserved involuntariness claims. *People v. Zadra*, 2013 COA 140, ¶ 26, *aff'd on other grounds*, 2017 CO 18; *People v. Villarreal*, 131 P.3d 1119, 1123 (Colo. App. 2005), *aff'd on other grounds*, 2012 CO 64; *People v. Vigil*, 104 P.3d 258, 267 (Colo. App. 2004), *aff'd in part and rev'd in part on other grounds*, 127 P.3d 916 (Colo. 2006); *People v. Salyer*, 80 P.3d 831, 835 (Colo. App. 2003). But none of these opinions disclosed whether the defendant made any argument that his or her voluntariness claim should be reviewed for

51

plain error, much less determined that the defendant had waived, rather than forfeited, his or her claims.[7]

¶ 96    The vice in applying special rules to preclude even plain error review of an unpreserved claim of the wrongful admission of involuntary statements is further illustrated by the distinction between two very different types of suppression issues commonly faced by courts.  The first is a claim that the evidence obtained by the police — either physical evidence or inculpatory statements by a defendant — should be suppressed because the Fourth Amendment was violated in obtaining the evidence.  *People v. Jorlantin*, 196 P.3d 258, 261 (Colo. 2008).  Suppression of relevant evidence under the Fourth Amendment has little to do with the reliability of the evidence; in most cases the evidence is highly reliable and probative of the defendant's guilt.  *See Alderman v. United States*, 394 U.S. 165, 174 (1969).  Nevertheless, for reasons having nothing to do with the reliability of the evidence, the United States Supreme Court has held that the Constitution requires that evidence

---

[7] The concurrence relies on out-of-state authority and federal circuit cases to support its argument that unpreserved voluntariness claims are waived.  We are, of course, not bound by those cases.

obtained in violation of the Fourth Amendment usually must be suppressed to provide an enforcement mechanism for the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). Because reliability forms no part of this equation, the application of a procedural rule requiring that such objections be made at a specific time, or else they are waived for all time, is justifiable. *See, e.g., People v. Gouker*, 665 P.2d 113, 118 (Colo. 1983) (refusing to address unpreserved claim that warrant was invalid).

¶ 97     The other type of suppression issue — the type presented here — is the admission of evidence that arguably violates the Due Process Clause because the statements made by an accused were made involuntarily. *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010). Unlike Fourth Amendment suppression, this type of suppression directly implicates the reliability of the conviction obtained. *Rogers v. Richmond*, 365 U.S. 534, 541 (1961).

¶ 98     Everyone would agree that false confessions are a stain on our judicial system. *See, e.g.*, Richard A. Leo et al., *Promoting Accuracy in the Use of Confession Evidence: An Argument for Pretrial Reliability Assessments to Prevent Wrongful Convictions*, 85 Temp. L. Rev. 759, 766 (2013) ("[T]he problem of contamination is epidemic,

not episodic, in cases of false confessions." (quoting Laura H. Nirider et al., *Combating Contamination in Confession Cases*, 79 U. Chi. L. Rev. 837, 849 (2012))). False confessions are especially dangerous because "[a] confession is like no other evidence . . . the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citation omitted).

¶ 99 For this reason alone, we should be very circumspect before allowing a procedural default to preclude all review of whether a defendant's inculpatory statements were made voluntarily when the issue is obvious from the admission of evidence, either at a suppression hearing or at trial.

¶ 100 Given the purpose of plain error review, it was incumbent on the majority and the concurrence to explain why this situation differs materially from all of the other situations in which plain error review indisputably is available. In my view, neither the majority nor the concurrence met that burden. At bottom, I am mystified why the majority and the concurrence single out this particular type of error from all of the other types of errors (many of

which are far less consequential that what happened in this case) and conclude that Cardman is remediless.[8]

## II. The Merits of Cardman's Involuntariness Claim

¶ 101 The statements of the detective during his interrogation of Cardman illustrate far better than my characterizations the nature and risks of the tactics used by the police to coerce Cardman's confession[9]:

> [Detective:] [After a suspect invokes his right to counsel,] [o]ur department policy asks that we wait twenty-four hours before we re-contact the suspect and give him one last shot to say — hey, this is the information we've uncovered, can you explain some things? There is some gray area, and I just want to make sure that the stuff that happened is as much as she's talking about. . . .
>
> [Detective:] Because we can — if we can provide an explanation to help this go away for you —

---

[8] The concurrence says that Cardman is not remediless because he may challenge his lawyer's failure to move to suppress the statements in a postconviction proceeding premised on ineffective assistance of counsel. That is true in theory. In practice, however, because of the many (appropriate) hurdles to postconviction relief, such relief is exceedingly rare.

[9] This is not a case in which the trial court did not hear evidence regarding the arguably coercive tactics used by the police. All of it was on full display during the trial despite the fact that Cardman did not expressly raise the voluntariness issue in his motion to suppress or at the suppression hearing.

[Cardman:] I would love that.

[Detective:] So let's fix that.  Let's fix that. Because right now, it's not going away. . . .

[Detective:] [I]f maybe you could meet [the victim] halfway on some of those things, that we can put the icing on the cake, put this in a drawer, have her go heal, have you turned around, get back with your wife, go to church, live your life, and put all of this behind you, right now today.

[Cadman:] I would love that, you have no idea.

[Detective:] Then let's do it. . . .

[Detective:] We both know where you wanna go in life and with your wife and church and everything.  I'm not here to hang you, I'm not here to beat you up today.  I'm here to do this [sounds of paper shuffling].  At the end of this sentence, I put this in a drawer.  And I can't do that if you tell me that you had sex with this girl fifty, sixty times, I'm concerned.  And then I have a different investigation.  If there was some inappropriate sexual stuff that happened once or twice, I want an explanation for that so I can do this [sounds of paper shuffling], so I can go home on my Friday, do you understand? I'm trying to paint the picture, man.

[Cardman:] If I can get this all figured out, closed out, just done with, I can go home tomorrow.

[Detective:] Let's do it.

[Cardman:] That's what I want to do.

56

[Detective:] And if I can help with any of that here, I'd — you're damn skippy. . . .

[Detective:] Because I honestly think that if you can provide some sort of corroboration and some answers, maybe [inaudible] an apology or quick sorry for whatever it is, and I give that to [the victim], I think that would go away. . . .

[Detective:] What we don't want to hear is that Ryan Cardman wakes up over here every day and lusts for sexual contact with a kid. And there's fifty, sixty times like what's she's saying. We don't want to hear that. But what is explainable and what people understand is . . . there was an accident, a momentary, one-time lapse and a bad decision occurred. People understand that, okay? What people don't understand is this guy over here who wakes up every day to wait 'til she's alone, 'til you're alone, to do those things. That guy is the one we're worried about. That's the guy that we try to send to prison and to lock up and that's what I want to eliminate here today. And, Ryan, I don't think you're that guy.[10]

(Emphasis added.)

¶ 102    At the conclusion of the interrogation, Cardman confessed to instances of sexual contact with the victim. He continued to deny that he sexually assaulted her.

_____

[10] There is no transcript of the interview in the record and the audio recording is very difficult to understand. The excerpts I quote are my best approximation of what was said based on the audio recording.

¶ 103    Applying any standard, this record is sufficiently disturbing to require findings by the trial court on this critical question.[11]  In my view, the italicized portions of the interrogation that I reproduced above violate any reasonable standard of constitutional police conduct and compel a conclusion that the police engaged in coercive conduct.

¶ 104    Reviewing the voluntariness issue for plain error, I would hold that, as a matter of law, the police engaged in coercive conduct. Therefore, I would remand to the trial court for a determination whether, under all of the circumstances, Cardman's confession was involuntary and thus inadmissible for any purpose.  *People v. Freeman*, 668 P.2d 1371, 1378 (Colo. 1983).  The majority's failure to do so leaves me with the firm belief that justice has not been

---

[11] I cannot accept the concurrence's rationale that because a substantial amount of time has passed since Cardman's trial that no purpose would be served by remanding for findings on voluntariness.  The recording of Cardman's police interview speaks volumes.  Moreover, both this court and the supreme court often remand to a trial court for findings years after the trial took place.  *See, e.g., O'Hara v. People*, 2012 CO 18, ¶ 48 (remanding for additional findings some six years after the trial); *People v. Lucero*, 747 P.2d 660, 665 (Colo. 1987) (four years); *People v. Desantiago*, 2014 COA 66M, ¶ 22 (three years); *People v. King*, 292 P.3d 959, 960 (Colo. App. 2011) (three years); *People v. Stevenson*, 228 P.3d 161, 164 (Colo. App. 2009) (three years).

done in this case and the convictions which the court affirms may be unreliable.

### III. Enforcement of the Police Promises

¶ 105    In its order granting certiorari, the supreme court also directed us to consider whether any promises made by the police to Cardman must be enforced.  *Cardman v. People*, (Colo. No. 16SC789, Apr. 10, 2017) (unpublished order).  The majority and the concurrence decline to address this question because they conclude that any claim for enforcement of police promises was waived for the same reason that plain error review is unavailable on the question whether Cardman's statements were voluntary.

¶ 106    The standard for specific enforcement of police promises is daunting.  *See, e.g.*, *People v. Marquez*, 644 P.2d 59, 62 (Colo. App. 1981).  Specific performance is required only when "no other remedy is available to the court that could approximate substantial justice under the circumstances of the case."  *People v. Manning*, 672 P.2d 499, 512 (Colo. 1983).

¶ 107    In my view, while the police conduct in this case undoubtedly was unconstitutional, I cannot say that there was no remedy available to the court aside from specific performance.  I believe the

appropriate remedy is to suppress Cardman's inculpatory statements and hold a new trial without his statements, which would provide "substantial justice under the circumstances." *Id.* Therefore, reaching the merits of Cardman's claim that he is entitled to specific performance of the promises, I would reject that claim.

## IV. Conclusion

¶ 108   The judgment of conviction should be reversed and the case should be remanded to the trial court for findings and conclusions on whether Cardman's inculpatory statements were voluntarily made. If they were involuntary, they may not be used for any purpose and a new trial is required. I respectfully dissent from the majority's contrary determination.